Slip Op. 15-103

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|                                           | :  |                                    |
|-------------------------------------------|----|------------------------------------|
| YANTAI XINKE STEEL STRUCTURE CO., LTD.,    | :  |                                    |
|                                           | :  |                                    |
| Plaintiff,                                | :  |                                    |
|                                           | :  |                                    |
| v.                                        | :  |                                    |
|                                           | :  | Before: Richard K. Eaton, Judge    |
| UNITED STATES,                            | :  |                                    |
|                                           | :  | Court No. 10-00239                 |
| Defendant,                                | :  |                                    |
|                                           | :  |                                    |
| and                                       | :  |                                    |
|                                           | :  |                                    |
| ALABAMA METAL INDUSTRIES CORPORATION and FISHER AND LUDLOW, | :  |   |
|                                           | :  |                                    |
| Defendant-Intervenors.                    | :  |                                    |

_____

**<u>OPINION</u>**

[The Department of Commerce's Final Determination is sustained.]

Dated: September 15, 2015

*David J. Craven*, Riggle and Craven, of Chicago, IL, for plaintiff.

*Michael Snyder*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for defendant. With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Thomas M. Beline*, Attorney-International, Office of the Chief Counsel for Import Administration, United States Department of Commerce.

*Alan H. Price*, *Timothy C. Brightbill*, *Christopher B. Weld*, and *Tessa V. Capeloto*, Wiley Rein, LLP, of Washington, DC, for defendant-intervenors.

EATON, Judge: Before the court is one in a series of cases that challenge the

United States Department of Commerce's ("Commerce" or the "Department") ability to apply

the countervailing duty laws to imports from a nonmarket economy country[1] that were also

subject to antidumping duties.  Pursuant to USCIT Rule 56.2, plaintiff Yantai Xinke Steel

Structure Co., Ltd. ("Xinke" or "plaintiff") moves for judgment on the agency record,

challenging the Final Determination of Commerce in *Certain Steel Grating from the People's

Republic of China*, 75 Fed. Reg. 32,362 (Dep't of Commerce June 8, 2010) (final affirmative

countervailing duty determination), and accompanying Issues and Decision Memorandum

("Issues & Dec. Mem.") (collectively, "Final Determination").  *See* Mot. for J. on the Agency R.

Submitted Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade

(ECF Dkt. No. 35) ("Pl.'s Mot.").  Defendant, the United States ("defendant"), opposes

plaintiff's motion and asks that the Department's Final Determination be sustained.  *See* Def.'s

Resp. to Pl.'s and Pl.-Int.'s Mots. for J. upon the Agency R. (ECF Dkt. No. 49).  Defendant-

intervenors Alabama Metal Industries Corporation and Fisher and Ludlow ("defendant-

intervenors"), which are domestic producers of steel grating, join in opposition to plaintiff's

motion.  *See* Resp. Br. of Alabama Metal Industries Corporation and Fisher and Ludlow (ECF

---

[1]      A "nonmarket economy country" is a "foreign country that the [Department]
determines does not operate on market principles of cost or pricing structures, so that sales of
merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C.
§ 1677(18)(A).  "Because the Department deems the [People's Republic of China ('PRC')] 'to
be a nonmarket economy country, Commerce generally considers information on sales in [the
PRC] and financial information obtained from Chinese producers to be unreliable for
determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise.'"  *Jacobi
Carbons AB v. United States*, 38 CIT __, __ n.11, 992 F. Supp. 2d 1360, 1365 n.11 (2014)
(alteration in original) (quoting *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT
480, 481, 318 F. Supp. 2d 1339, 1341 (2004)), *aff'd*, Appeal No. 2014-1752 (Fed. Cir. Aug. 3,
2015).

Dkt. No. 51).  Jurisdiction lies pursuant to 28 U.S.C. § 1581(c).  For the reasons set forth below,

Commerce's Final Determination is sustained.


# BACKGROUND

In 2009, Commerce initiated an investigation of producers and exporters of steel grating

from the People's Republic of China ("PRC") for the period of investigation January 1, 2008

through December 31, 2008 ("POI") to determine whether they were receiving countervailable

subsidies within the meaning of 19 U.S.C. § 1671.  Thereafter, the United States International

Trade Commission ("ITC") commenced an investigation of its own to determine whether an

industry in the United States was materially injured or threatened with material injury by reason

of these imports.  *See* Certain Steel Grating From the PRC, 74 Fed. Reg. 30,278, 30,278 (Dep't

of Commerce June 25, 2009) (initiation of countervailing duty investigation).  In November

2009, Commerce published its preliminary affirmative countervailing duty determination.  *See*

Certain Steel Grating from the PRC, 74 Fed. Reg. 56,796, 56,796 (Dep't of Commerce Nov. 3,

2009) (preliminary affirmative countervailing duty determination and alignment of final

countervailing duty determination with final antidumping duty determination) ("Preliminary

Determination").  Subsequently, on June 8, 2010, as a result of the ITC's injury determination

following Commerce's own investigation and resulting determination "that countervailable

subsidies [were] being provided to producers and exporters of steel grating from the [PRC]"

during the POI, the Department issued a countervailing duty order on certain steel grating from

the PRC.  *See* Final Determination, 75 Fed. Reg. at 32,362; Certain Steel Grating from the PRC,

75 Fed. Reg. 43,144 (Dep't of Commerce July 23, 2010) (countervailing duty order).

In September 2010, Xinke commenced this action, challenging the Department's Final Determination. *See* Compl. (ECF Dkt. No. 8). Thereafter, Ningbo Jiulong Machinery, Co., Ltd. ("Jiulong"), the sole mandatory respondent selected in Commerce's underlying investigation,[2] intervened as a plaintiff-intervenor. *See* Order (ECF Dkt. No. 22); Final Determination, 75 Fed. Reg. at 32,364. In March and April 2011, Xinke and Jiulong each separately moved for judgment on the agency record pursuant to USCIT Rule 56.2. *See* Pl.'s Mot.; Pl.-Ints.' Mem. in Supp. of Mot. for J. on the Agency R. Submitted Pursuant to Rule 56.2 (ECF Dkt. No. 37). Subsequently, the court stayed this action pending a final decision in *GPX International Tire Corp. v. United States*, Ct. No. 08-00285. *See* Order (ECF Dkt. No. 75).

Following the issuance of the United States Court of Appeals for the Federal Circuit's mandate in *GPX* on May 4, 2015, Jiulong voluntarily dismissed its case and withdrew its claims. *See* Stipulation of Withdrawal (ECF Dkt. No. 83). Thereafter, the remaining parties (i.e., Xinke, defendant, and defendant-intervenors) submitted a joint status report stating that, in light of *GPX*, Xinke had abandoned the majority of its case and that the only remaining issue to be resolved by the court was its "claim regarding the application of partial facts available to the sole mandatory respondent" (i.e., Jiulong). Joint Status Report 2 (ECF Dkt. No. 85). The parties represented to

---

[2]      The Department initially selected two mandatory respondents to review during the investigation, Jiulong and United Steel Structures, Ltd. ("USSL"). Final Determination, 75 Fed. Reg. at 32,364. The Department determined, however, after reviewing USSL's questionnaire responses, that the company was neither a steel grating exporter nor a producer of subject merchandise, and thus "would be an inappropriate mandatory respondent in th[e] investigation." Final Determination, 75 Fed. Reg. at 32,364 (citation omitted). Further, because it did not decide to remove USSL as a mandatory respondent until three days before publication of the Preliminary Determination, "the Department determined that it could not select an additional mandatory respondent [for which] to calculate an individual rate . . . in this investigation." *See* Final Determination, 75 Fed. Reg. at 32,364. Following USSL's removal, because there was only one respondent remaining in the investigation (i.e., Jiulong), the company-specific rate calculated for Jiulong also served as the "all-others" rate. Final Determination, 75 Fed. Reg. at 32,364 (citing 19 U.S.C. § 1671d(c)(5)(A)(i)).

the court "that this issue ha[d] been fully briefed and c[ould] be ruled upon by the [c]ourt without

further briefing or argument."  Joint Status Report 2.


## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19

U.S.C. § 1516a(b)(1)(B)(i).


## DISCUSSION

### I.   LEGAL FRAMEWORK

"The Tariff Act provides that before Commerce imposes a countervailing duty on

merchandise imported into the United States, it must determine that a government is providing,

directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or

export of that merchandise."  *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir.

2000) (citing 19 U.S.C. § 1671(a)(1) (1994)).  A countervailable subsidy is present where "an

authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred."

19 U.S.C. § 1677(5)(B)(i).  The countervailing duty statute describes the term "authority" to

mean "a government of a country or any public entity within the territory of the country."  *Id.* §

1677(5)(B).  A "benefit," as defined by the statute, is conferred where "goods or services are

provided for less than adequate remuneration."  *Id.* § 1677(5)(E)(iv).  When determining the

amount of any subsidy, "the adequacy of remuneration shall be determined in relation to

prevailing market conditions for the good or service being provided or the goods being

purchased in the country which is subject to the investigation or review.  Prevailing market

conditions include price, quality, availability, marketability, transportation, and other conditions

of purchase or sale." *Id.* § 1677(5)(E).


II.     **COMMERCE'S FINAL DETERMINATION IS SUSTAINED**

During the investigation, Commerce endeavored to determine whether producers and

exporters of steel grating from the PRC received inputs from the government of the PRC ("PRC

government") for less than adequate remuneration during the POI.  Commerce preliminarily

found eleven programs from which Jiulong had received a benefit to be countervailable during

the preliminary phase of its investigation.  *See* Preliminary Determination, 74 Fed. Reg. at

56,801–03; Mem. from Sean Carey, International Trade Compliance Analyst, AD/CVD

Operations, to the File at 2, CD 25 (Oct. 26, 2009), ECF Dkt. No. 24 ("Prelim. Calculation

Mem.").  Included among these programs were two that subsidized the acquisition of the steel

inputs of hot-rolled steel and steel wire rod used in the manufacture of subject merchandise.  *See*

Preliminary Determination, 74 Fed. Reg. at 56,798–801; Prelim. Calculation Mem. at 2, Attachs.

5, 7.  After taking the eleven programs into account, Commerce preliminarily calculated a total

net countervailable subsidy rate for Jiulong of 7.44 percent *ad valorem*, which also constituted

the all-others rate that was preliminarily assigned to Xinke.  *See* Preliminary Determination, 74

Fed. Reg. at 56,804; Prelim. Calculation Mem. at 1.

Following the Preliminary Determination, the Department sought further information

regarding the identities of the producers of the hot-rolled steel and steel wire rod inputs used in

the manufacture of Jiulong's subject merchandise in order to determine whether the PRC

government (i.e., an authority) had provided these inputs (i.e., goods, such as hot-rolled steel and

steel wire rod) for less than adequate remuneration.  Issues & Dec. Mem. at IV.  Specifically,

Commerce asked Jiulong to provide the mill test certificates that it received with its purchases

wire rod and hot-rolled steel from its suppliers.  Issues & Dec. Mem. at IV.  Jiulong produced

documents it claimed were the mill test certificates provided by its suppliers, but the Department

determined that "the documents provided by . . . Jiulong contained material discrepancies, were

unreliable, contained large duplications of data, and were unverifiable. . . . Jiulong itself [also]

admitted that the mill test certificates that it received from its suppliers had been fabricated."

Issues & Dec. Mem. at IV.

   Prior to reaching these conclusions, the Department conducted a verification of Jiulong's

questionnaire responses where it reviewed the company's sales processes and the use of mill

certificates in the production of its steel grating, and determined that certain mill test certificates

supplied by Jiulong were fabricated and that it "was unable to verify the authenticity or

reliability of [any of] these mill test certificates."  Issues & Dec. Mem. at cmt. 4.  "Although

explicitly asked at verification to confirm that it had provided all mill certificates . . . Jiulong

provided to its customers[,] . . ." Commerce found that "Jiulong did not provide all such

documents."  Issues & Dec. Mem. at IV.  Commerce further found, based on Customs

information obtained after verification, that, contrary to the company's claims, Jiulong itself

prepared for its purchasers "mill certificates and [it] failed to inform the Department of these

certificates when asked at verification."  Issues & Dec. Mem. at IV.  The significance of these

mill test certificates for Commerce was that they identify the producers and types of steel

purchased by Jiulong that it used in the manufacture of its subject merchandise.

   The Department thus concluded that "Jiulong withheld information that was requested

and failed to provide information that could be verified with respect to the provision of hot-rolled

steel and wire rod at [less than adequate remuneration]."  Issues & Dec. Mem. at cmt. 4.  It

determined further that Jiulong had "submitted inaccurate and unreliable information concerning

its purchases of hot-rolled steel and wire rod," which "Jiulong admitted . . . contained errors."

*See* Issues & Dec. Mem. at cmt. 4.

"In failing to provide reliable information in response to the Department's questionnaires

concerning mill test certificates, including the Department's questions at verification, and in

withholding information expressly requested by the Department," Commerce "determine[d] that

. . . Jiulong ha[d] significantly impeded this proceeding," and thus, that the use of "facts

otherwise available"[3] was warranted.  Issues & Dec. Mem. at cmt. 4 (citing 19 U.S.C. §

1677e(a)(2)(A), (C), (D)).  It determined further that "Jiulong's incomplete and inaccurate

statements regarding the mill certificates demonstrate[d] that . . . Jiulong ha[d] not cooperated to

the best of its ability in this investigation, thereby warranting the use of an adverse inference"[4]

---

[3]        Pursuant to 19 U.S.C. § 1677e(a),
[i]f—
        (1) necessary information is not available on the record, or
        (2) an interested party or any other person—
            (A) withholds information that has been requested by [Commerce] or the
        Commission under this subtitle,
            (B) fails to provide such information by the deadlines for submission of the
        information or in the form and manner requested, . . .
            (C) significantly impedes a proceeding[,] . . . or
            (D) provides such information but the information cannot be verified[,] . . .
        the [Department] shall . . . use the facts otherwise available in reaching the
        applicable determination . . . .
19 U.S.C. § 1677e(a).

[4]        Where, as here, the Department
finds that an interested party has failed to cooperate by not acting to the best of its
ability to comply with a request for information[,] . . . in reaching the applicable
determination[, Commerce] . . . may use an inference that is adverse to the interests
of that party in selecting from among the facts otherwise available.  Such adverse
inference may include reliance on information derived from—
        (1) the petition,
        (2) a final determination in the investigation[,]
        (3) any previous review . . . or determination[,] . . . or
        (4) any other information placed on the record.
19 U.S.C. § 1677e(b).

with respect to the facts used to determine whether the PRC government had provided

countervailable subsidies to Jiulong in the form of the provision of hot-rolled steel and steel wire

rod for less than adequate remuneration.  *See* Issues & Dec. Mem. at cmt. 4; *see* 19 U.S.C. §

1677e(b).

Based on its conclusion that Jiulong had "significantly impeded" the investigation by

submitting unreliable mill test certificates, the Department used "adverse facts available"

("AFA") to determine Jiulong's rate.  *See* Issues & Dec. Mem. at cmt. 4 (citing 19 U.S.C. §

1677e(a)(2)(A), (C), (D); 19 U.S.C. § 1677e(b)).  Thus, in the Final Determination, the

Department constructed a countervailing duty rate for Jiulong by assigning an *ad valorem*

percentage of 44.91 percent to the hot-rolled steel input provided by the PRC government and an

*ad valorem* percentage of 15.31 percent to the wire rod provided by the PRC government.  *See*

Issues & Dec. Mem. at V.A.1, 2.  After making other adjustments not at issue here, the

Department assigned Jiulong, the sole mandatory respondent, a total net countervailing duty rate

of 62.46 percent *ad valorem*, which also served as the all-others rate, and was thus also the rate

assigned to Xinke.  *See* Final Determination, 75 Fed. Reg. at 32,364; Mem. from Nicholas

Czajkowski, International Trade Compliance Analyst, AD/CVD Operations, to the File at

Attach. I, CD 65 (May 28, 2010), ECF Dkt. No. 88-1 ("Final Calculation Mem.").

In selecting the 44.91 percentage for the PRC Government Provision of Hot-Rolled Steel

for Less than Adequate Remuneration program and the 15.31 percentage for the PRC

Government Provision of Wire Rod for Less than Adequate Remuneration program based on

AFA, the Department "adopted the practice to use the highest rate calculated for the same

program[s] in other PRC [countervailing duty] investigations."  Issues & Dec. Mem. at cmt. 4

(citing Certain Tow-Behind Lawn Groomers and Certain Parts Thereof From the PRC, 74 Fed.

Reg. 29,180 (Dep't of Commerce June 19, 2009) (final affirmative countervailing duty

determination), and accompanying Issues and Decision Memorandum at IV ("Lawn Groomers

Issues & Dec. Mem.")).  It thus selected, "as AFA rates[,] the program-specific rates calculated

for cooperating respondents in a prior PRC [countervailing duty] case for the provision of hot-

rolled steel for [less than adequate remuneration] and the provision of wire rod for [less than

adequate remuneration]."  Issues & Dec. Mem. at cmt. 4.  On this basis, it applied the rate of

44.91 percent *ad valorem*, as calculated in *Circular Welded Carbon Quality Steel Pipe from the

PRC*, 73 Fed. Reg. 42,545 (Dep't of Commerce July 22, 2008) (notice of amended final

affirmative countervailing duty determination and notice of countervailing duty order), to the

hot-rolled steel received by Jiulong, and the rate of 15.31 percent *ad valorem*, as calculated in

*Pre-Stressed Concrete Steel Wire Strand from the PRC*, 75 Fed. Reg. 28,557 (Dep't of

Commerce May 21, 2010) (final affirmative countervailing duty determination), and

accompanying Issues and Decision Memorandum at I.A ("PC Strand from the PRC Issues &

Dec. Mem."), to the steel wire rod subsidy received by Jiulong.  *See* Issues & Dec. Mem. at IV.

        Despite the deficiencies in Jiulong's mill test certificates, however, the Department did

not apply AFA to all of the subsidy programs under investigation.  That is, Commerce did not

apply adverse facts available to the other programs it investigated or the ten other programs it

had found to be countervailable,[5] determining that "the implications of unreliable mill test

certificates [were] limited to the two [less than adequate remuneration] programs at issue."

Issues & Dec. Mem. at cmt. 4.  In other words, Commerce determined that the record showed

that "Jiulong submitted unreliable and unverifiable information (*i.e.*, mill test certificates) with

regard to these two programs [(i.e., for hot-rolled steel and steel wire rod)], such that the

application of AFA [was] warranted with regard to [only] these two programs."  Issues & Dec.

Mem. at cmt. 4.  It further determined that the "unverifiable information with regard to these two

programs" did not justify the application of AFA "to all programs under investigation for

purposes of the [F]inal [D]etermination."  *See* Issues & Dec. Mem. at cmt. 4.

    Xinke challenges Commerce's use of AFA to calculate Jiulong's subsidy rate, although it

does not challenge the calculation of the AFA rate itself.  The entirety of Xinke's argument, that

Commerce abused its discretion when it took partial adverse inferences against Jiulong, the sole

mandatory respondent in the investigation, is as follows:

---

[5]       In the Final Determination, Commerce found twelve programs to be
countervailable, rather than eleven, as was found in the Preliminary Determination.  *See* Final
Calculation Mem. at Attach. 1.  The change between the Preliminary Determination and Final
Determination, i.e., the additional program that Commerce found to be countervailable in the
Final Determination, was the "Government Provision of Electricity for Less than Adequate
Remuneration" program.  *See* Final Calculation Mem. at 2.
       In addition to the countervailable subsidies received by Jiulong for its purchases of hot-
rolled steel and wire rod, the Department determined ten other programs to be countervailable
and calculated an *ad valorem* percentage for each: (1) 1.68 percent *ad valorem* for "Income Tax
Credits for Domestically Owned Companies Purchasing Domestically Produced Equipment"; (2)
0.06 percent *ad valorem* for "Government Provision of Electricity for [Less than Adequate
Remuneration]"; (3) 0.09 percent *ad valorem* for "Export Grant 2006, 2007, 2008"; (4) 0.04
percent *ad valorem* for "Jiulong Lake Town Grant 2008"; (5) 0.14 percent *ad valorem* for
"Energy Saving Grant 2008"; (6) 0.01 percent *ad valorem* for "Foreign Trade Grant 2008"; (7)
0.02 percent *ad valorem* for "Famous Brand Grant 2008"; (8) 0.04 percent *ad valorem* for
"Innovative Small- and Medium-Sized Enterprise Grant 2008"; (9) 0.14 percent *ad valorem* for
"Water Fund Refund/Exemption 2008"; and (10) 0.02 percent *ad valorem* for "Product Quality
Grant."  *See* Issues & Dec. Mem. at V.A; Final Calculation Mem. at Attach. I.

> The Department improperly took partial adverse inferences against the sole mandatory respondent. This determination was based on a finding that the sole mandatory respondent had failed to provide acceptable test certificates showing the producer of the steel. The Department stated that these certificates were critical to establish the identity of the producers and whether they were state controlled. As these certificates were not "sufficient" the Department assumed that these suppliers were state controlled. However, instead of calculating the [countervailing duty] based on the actual price or prices paid by the sole mandatory respondent, which would be the proper calculation if these suppliers were state controlled, the Department simply assigned the highest rate ever found for these two programs as "facts available."
>
> This decision is simply unsupported by the evidence. As stated in the [Issues and Decision Memorandum], the purpose of obtaining the test certificates was to [learn] the identity of the producers. As evidenced by the fact that all of the financial data was used in the rest of the [countervailing duty] calculations, the accuracy of the purchase prices for the steel was not at issue. The Department accepted and used the verified financial accounting data for the mandatory respondent for all other purposes in this investigation. Thus, as the purported deficiency had nothing to do with calculation, and as such deficiency was easily addressed by assuming that the suppliers were state-controlled, the Department should have conducted an analysis in this investigation using these prices reported for the Steel Wire Rod and Hot-Rolled Steel. The Department should not have taken partial adverse inferences for these two programs.

Mem. in Supp. of Mot. for J. on the Agency R. Submitted Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade 28–29 (ECF Dkt. No. 35-1) (citations omitted). In other words, plaintiff does not challenge Commerce's determination that Jiulong failed to cooperate to the best of its ability and thus its underlying determination to apply AFA to determine Jiulong's rate. Rather, plaintiff challenges the extent to which the Department applied adverse inferences in the calculation of the steel input subsidies received by Jiulong and thus its rate, which was in turn assigned to Xinke as the all-others rate. In making its case, plaintiff argues that, although Commerce was unable to determine the identity of Jiulong's steel input suppliers, it did not make a finding that the purchase prices of Jiulong's steel inputs were inaccurate. Hence, for plaintiff, Commerce should have used these purchase prices as part of its less-than-adequate-remuneration analysis without applying AFA because it did not find these

purchase prices to be deficient, and because it had used Xinke's other financial information in its

calculations for other aspects of the Final Determination.

Importantly, Xinke does not object to the application of AFA to the facts relating to the

two Chinese countervailable subsidy programs.  Rather, the company seems to misunderstand

the purpose of applying AFA.  Because of this misunderstanding, the court is unpersuaded by

plaintiff's remaining argument and thus holds that Commerce's determination is in accordance

with law.

Pursuant to 19 U.S.C. § 1677e(a)(2)(C), when a party "significantly impedes a

proceeding," the Department must "use 'facts otherwise available . . . to fill in the gaps when

Commerce has received less than the full and complete facts needed to make a determination

from the respondents.'"  *See Xiping Opeck Food Co. v. United States*, 38 CIT __, __, 34 F. Supp.

3d 1331, 1346–47 (2014) (alteration in original) (quoting *Foshan Shunde Yongjian Housewares

& Hardware Co. v. United States,* 35 CIT __, __, Slip Op. 11-123, at 7 (2011)) (internal

quotation marks omitted); 19 U.S.C. § 1677e(a)(2)(C).  When Commerce further determines that

a party has failed to cooperate to the best of its ability by failing to comply with the

Department's requests for information, it "may use an inference that is adverse to the interests of

that party in selecting from among the facts otherwise available," to determine that party's

countervailing duty rate.  19 U.S.C. § 1677e(b).

Although the unfair trade "laws 'are remedial not punitive,'" a "rate based on AFA is

designed 'to provide respondents with an incentive to cooperate'" with Commerce's

investigations.  *See KYD, Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010) (quoting *NTN

Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995); *F.lli De Cecco Di Filippo

Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).  Congress

"[i]ntended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." *De Cecco*, 216 F.3d at 1032.  Thus, "in selecting a reasonably adverse facts-available rate, Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance, rather than creating an overly punitive result." *Timken Co. v. United States*, 354 F.3d 1334, 1345 (Fed. Cir. 2004) (citing *De Cecco*, 216 F.3d at 1032).  As described by the Federal Circuit, the underlying logic of the AFA provision is that, "[w]ithout the ability to enforce full compliance with its questions, Commerce runs the risk of gamesmanship and lack of finality in its investigations." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012).

Here, it is undisputed that, by supplying inaccurate mill test certificates, Jiulong failed to cooperate to the best of its ability during the investigation and that necessary information was missing from the record, thereby warranting the use of AFA to calculate Jiulong's countervailing duty rate.  *See* 19 U.S.C. § 1677e(a)(2)(A), (C), (D); *id.* § 1677e(b).  The court must decide, however, whether the extent to which the Department applied an adverse inference, in this case, was lawful.

As noted, Commerce determined that it could not rely on the mill certificates submitted by Jiulong for purposes of determining whether the PRC government provided countervailable subsidies to Jiulong in the form of the provision of hot-rolled steel and steel wire rod for less than adequate remuneration.  *See* Issues & Dec. Mem. at cmt. 4.  Importantly, in reaching its determination to apply AFA to these two subsidy input programs in the Final Determination, Jiulong went from being a cooperating respondent in the Preliminary Determination to an

uncooperative party in the Final Determination.  When applying AFA, Commerce stated that it

was

> not basing its decision on . . . Jiulong's inability to provide all of the mill test
> certificates from the entire POI, or on . . . Jiulong's claim that it does not use or
> record the mill certificates in its financial or production record-keeping, but rather
> upon . . . Jiulong's submission of erroneous and unreliable mill test certificates and
> [its] failure to inform the Department that it generates its own mill test certificates
> for its United States customers and to provide copies thereof to the Department.

Issues & Dec. Mem. at cmt. 4.  In drawing adverse inferences from the facts available as to the

two input programs (i.e., the provisions of hot-rolled steel and wire rod for less than adequate

remuneration), the Department selected, as adverse inferences, "the program-specific rates

calculated for cooperating respondents in a prior PRC [countervailing duty] case for the

provision of hot-rolled steel for [less than adequate remuneration] and the provision of wire rod

for [less than adequate remuneration]."  Issues & Dec. Mem. at cmt. 4.  That is, Commerce

assigned Jiulong the highest rate previously determined for each of the less-than-adequate-

remuneration programs, rather than basing the rate on the reported prices paid by Jiulong for its

steel.  The Department, in accordance with the statute, only applied an adverse inference to the

"facts otherwise available" with respect to the prices for hot-rolled steel and steel wire rod, i.e.,

the two inputs for which it had no usable information upon which it could rely as a result of

Jiulong's failure to cooperate.  *See* Issues & Dec. Mem. at cmt. 4.  Thus, the Department did not

apply AFA to the remaining financial information for Jiulong, including to the inputs that had

been subsidized by other programs, because Jiulong had cooperated in the provision of this

information and Commerce did not make a finding that this data was wanting.  *See* Issues & Dec.

Mem. at cmt. 4.

        Although Xinke objects to Commerce's use of anything other than the actual purchase

prices, plaintiff appears to misunderstand a primary purpose of the application of AFA.  Here, it

is clear that Commerce was entitled to use AFA, and apply an adverse inference to the facts used

to determine the rate for the two programs, in order to encourage future compliance.  Thus,

although plaintiff maintains that Commerce should have used the prices contained in Xinke's

financial data, had Commerce done so, it would have defeated a "purpose of 19 U.S.C. §

1677e(b), [which,] according to the [Uruguay Round Agreements Act] Statement of

Administrative Action ('SAA'),[6] . . . is to encourage future cooperation."  *Fine Furniture*

*(Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014) (citing SAA, H.R. DOC.

NO. 103-316, at 870 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199); *see also Mueller*

*Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1235–36 (Fed. Cir.

2014); *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002)

("It is clear . . . that [Congress] . . . intended for an adverse facts available rate to be a reasonably

accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a

deterrent to non-compliance." (quoting *De Cecco*, 216 F.3d at 1032) (internal quotation marks

omitted)); *De Cecco*, 216 F.3d at 1032 ("Thus, we are convinced that it is within Commerce's

discretion to choose which sources and facts it will rely on to support an adverse inference when

a respondent has been shown to be uncooperative.  Particularly in the case of an uncooperative

respondent, Commerce is in the best position, based on its expert knowledge of the market and

the individual respondent, to select adverse facts that will create the proper deterrent to non-

cooperation with its investigations and assure a reasonable margin."); *Ass'n of Am. Sch. Paper*

*Suppliers v. United States*, 32 CIT 1196, 1204 (2008) ("As to whether the rate was high enough

---

6        The SAA is "an authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements and this Act in any judicial
proceeding in which a question arises concerning such interpretation or application."  19 U.S.C.
§ 3512(d).

to encourage future compliance, Commerce reasoned that the AFA rate 'selected [23.17 percent

rate] is sufficiently higher than the calculated [3.91 percent] rate of the cooperative respondent

[Kejriwal] in this investigation to induce respondents [Navneet and Aero] to cooperate fully with

the Department's requests for accurate, complete and timely data.'" (alterations in original)

(citation omitted) (internal quotation marks omitted)); *Shandong Huarong Mach. Co. v. United*

*States*, 30 CIT 1269, 1294–95, 435 F. Supp. 2d 1261, 1284 (2006); *Chia Far Indus. Factory Co.*

*v. United States*, 28 CIT 1337, 1359, 343 F. Supp. 2d 1344, 1366 (2004).  In other words, given

(1) Jiulong's well-documented failure to provide accurate information with respect to the mill

test certificates in response to Commerce's questions relating to whether the PRC government

provided countervailable subsidies to Jiulong in the form of steel inputs for less than adequate

remuneration, and (2) Commerce's inability to verify certain documentation related to Jiulong's

steel inputs used in the manufacture of subject merchandise, the Department reasonably

determined that, had it relied on the purchase prices reported by Jiulong for its steel during the

POI, the resulting rate would not have encouraged future cooperation.  *See KYD*, 607 F.3d at 767

("[A] rate based on AFA is designed 'to provide respondents with an incentive to cooperate.'"

(quoting *De Cecco*, 216 F.3d at 1032)).

     Moreover, to the extent that plaintiff argues that the prices paid for the hot-rolled steel

and wire rod inputs must be used because it had no reason to believe they were unreliable, this

claim is simply beside the point.  Here, contrary to plaintiff's assertions, Commerce made a

specific finding as part of its Final Determination that the deficiencies in Jiulong's mill test

certificates did not undermine significant other data critical to the Department's countervailing

duty calculation to such an extent that it was unable to calculate an accurate subsidy for Jiulong.

*See* Issues & Dec. Mem. at cmt. 4.  Rather, Commerce found that "the implications of unreliable

mill test certificates [were] limited to the two [less-than-adequate-remuneration] programs at issue," and "the provision of unverifiable information with regard to these two programs [did not] warrant[] the application of . . . AFA to all programs under investigation for purposes of the [F]inal [D]etermination." *See* Issues & Dec. Mem. at cmt. 4.  Further, it may well be that the prices Jiulong paid were an accurate reflection of a fair market price less a subsidy.  As noted, however, here, the purpose of adding an additional amount to these prices was not to find an accurate countervailing duty, but to determine a duty high enough to encourage future cooperation.

Accordingly, the court holds that Commerce's determination to draw adverse inferences from the facts available as to the hot-rolled steel and wire rod less-than-adequate-remuneration programs is in accordance with law.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Determination is sustained.

Judgment will be entered accordingly.

Dated:          September 15, 2015
                New York, New York


                                          /s/ Richard K. Eaton
                                          Richard K. Eaton